The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>October 5, 2023</u>

**No. A-1-CA-39582**

**STATE OF NEW MEXICO ex rel.
DUANE DEARBORN,**

  Relator-Appellee,

v.

**STEPHANIE SCHARDIN CLARKE,
Cabinet Secretary of Taxation &
Revenue; and SANTIAGO CHAVEZ,
Director of Property Tax Division,**

  Respondents-Appellants.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Bryan Biedscheid, District Court Judge**

Peter B. Shoenfeld, P.A.
Peter B. Shoenfeld
Santa Fe, NM

for Appellee

New Mexico Taxation & Revenue Department
Raúl Torrez, Attorney General
David Mittle, Special Assistant Attorney General
Santa Fe, NM

for Appellants

**OPINION**

**YOHALEM, Judge.**

{1}     This is an appeal from a writ of mandamus directing the Department of Taxation and Revenue (the Department[1]) to issue and deliver a tax deed to Petitioner Duane Dearborn (Purchaser) for a property located in Santa Fe County (Parcel 114). The Department contends that it has no mandatory duty to issue a tax deed to the high bidder at auction because the tax sale was not conducted substantially in accordance with the Property Tax Code (the Code), NMSA 1978, §§ 7-35-1 to 7-38-93 (1973, as amended through 2023). The district court concluded that the Department's inadvertent error in sending potential bidders away from the auction, leaving Purchaser as the sole bidder for Parcel 114, was not "so substantial or egregious" as to violate the Code, and that issuance of the deed to Purchaser was mandatory. In the alternative, the district court concluded that even assuming the public auction of Parcel 114 was not substantially in accordance with the Code, the Department had a nondiscretionary duty to deliver a tax deed to Purchaser because the Department had accepted Purchaser's payment. We agree with the Department that Parcel 114 was not sold substantially in accordance with the public auction requirement of the Code. We also agree with the Department that the Code

---

[1]The parties and the relevant statutes sometimes refer to "the division," rather than "the Department." We refer uniformly to "the Department."

authorizes the Department to invalidate and reschedule a tax sale it determines was not conducted substantially in accordance with the Code, so long as the deed has not yet been issued and delivered to the purchaser. We, therefore, reverse and vacate the preemptive writ of mandamus issued by the district court.

**BACKGROUND**

**A.      Statutory Overview**

{2}      The Department was created "to establish a single, unified department to administer all laws and exercise all functions relating to taxation, revenue and vehicles charged to the department." NMSA 1978, § 9-11-3 (1987). Consistent with this purpose, the Legislature gave the Department broad authority to administer and enforce the Code. *See* §§ 7-38-1 to -93 (authorizing the Department to supervise the valuation of property, to supervise the imposition and payment of property taxes, to investigate potential violations of the Code, and to enforce the Code.) Importantly, the Department is given "the responsibility and exclusive authority to take all action necessary to collect delinquent taxes shown on the [tax delinquency] list." Section 7-38-62(A). At the Department's option, it may proceed in district court based on the personal liability of the taxpayer, or, as it did here, by taking "the actions authorized in the . . . Code for proceeding against the property subject to the tax for collection of delinquent taxes." *Id.* The Code provisions for proceeding against real property authorize the Department to collect the delinquent taxes due, along with

any penalty, interest, and costs "by selling the real property on which the taxes have become delinquent." Section 7-38-65(A). Sale is authorized only after a tax delinquency has remained unpaid for three years. *Id.* Any such sale "shall be in accordance with the provisions of the . . . Code." *Id.*

{3} The provisions of the Code governing the procedure for conducting a tax sale begin with the requirement for the Department to provide notice to the property owner by certified mail, return receipt requested, sent at least twenty days, but not more than thirty days, before the sale. *See* § 7-38-66(A). The notice must explain to the property owner their right to avoid sale of the property either by paying the delinquent property taxes, penalty, interest and costs in full, or by entering into an agreement to pay in installments by 5:00 p.m. the day before the scheduled sale. *Id.* Payment to the Department by 5:00 p.m. the day before the sale "shall prevent" or, if the sale has already occurred when payment is confirmed, shall "invalidate the sale." Section 7-38-66(G). The failure of the Department to mail the required notice to the property owner by certified mail, return receipt requested, also will "invalidate the sale," if discovered after the auction. Section 7-38-66(D).

{4} In addition to notice to the property owner, the Code also requires notice to potential purchasers prior to a tax sale. *See* § 7-38-67(B). The Legislature directs that notice of the sale to potential purchasers "shall be published in a local newspaper within the county where the real property is located . . . at least once a week for the

3

three weeks immediately preceding the week of the sale." *Id.* The property must be described sufficiently in the notice "to permit its identification and location by potential purchasers," and the minimum price must be disclosed. *Id.*

{5}     "The minimum price shall not be less than the total of all delinquent taxes, penalties, interest and costs." Section 7-38-67(E). In setting the minimum price, the Department "shall consider the value of the property owner's interest in the real property," as well as the amount of the debt to the state. *Id.* This Court held in *Cochrell v. Mitchell*, that the Code's direction to consider the value of the owner's interest in the property does not require the Department to include any additional amount in the minimum price representing the excess value of the property. 2003-NMCA-094, ¶¶ 28-29, 134 N.M. 180, 75 P.3d 396. Adopting the lowest permitted minimum price to attract potential purchasers to bid on the property satisfies the Department's obligation to "consider the value of the property owner's interest in the real property." Section 7-38-67(E).

{6}     The remaining requirements for a tax sale are found in Section 7-38-67(C) and 7-38-67(F). Section 7-38-67(C) charges the Department with the responsibility to conduct the sale by public auction: "Real property shall be sold at public auction either by the [D]epartment or an auctioneer hired by the [D]epartment." Section 7-38-67(F) requires that the Department collect payment from the high bidder "in full

4

by the close of the public auction before an offer may be deemed accepted by the department."

{7} Section 7-38-70 addresses the issuance of tax deeds by the Department following the public auction and defines the title conveyed by a tax deed. Section 7-38-70(A) states, "Upon receiving payment for real property sold for delinquent taxes, the [Department] shall execute and deliver a deed to the purchaser." Section 7-38-70(B) provides that "[i]f the real property was sold substantially in accordance with the . . . Code, the deed conveys all of the former property owner's interest in the real property as of the date of the state's lien." Section 7-38-70(D) provides four specific grounds, in addition to the sale not being conducted substantially in accordance with the Code,[2] which will defeat the title conveyed by a tax deed: (1) the real property was not subject to the allegedly delinquent taxes; (2) the Department failed to meet the Code's requirement for notice of the sale to the owner of the property by certified mail, return receipt requested; (3) the property owner paid the taxes, penalty, interest and costs by 5:00 p.m. on the day prior to the sale; or (4) the property owner entered into an installment agreement for payment by 5:00 p.m. on the day prior to the sale.

---

[2]This Court in *Cochrell* construed the Code to include, in addition to the four grounds listed in Section 7-38-70(D), the failure to conduct the sale substantially in accordance with the Code. *See* 2003-NMCA-094, ¶ 16.

5

**B.     Factual and Procedural Background**

{8}     As authorized by Sections 7-38-65(A) and -67(A) of the Code, after a three-year period of nonpayment of delinquent property taxes by the owner of Parcel 114, the Department placed this ten-acre parcel of land located in Santa Fe County, New Mexico, up for sale at public auction. Parcel 114 was scheduled to be auctioned on April 16, 2019.

{9}     In the lead up to the sale, the Department complied with the requirements of Section 7-38-66 for notice to the property owner of both the date and time of the planned sale and the property owner's right to prevent the sale by paying the taxes or entering into an installment agreement with the Department by 5:00 p.m. on the day before the scheduled tax sale. The Department also complied with the requirements of Section 7-38-67(B) for notice by publication to potential purchasers, describing the property and its location, the date and time of the public auction, and the minimum price.

{10}     At approximately 4:00 p.m. on April 15, 2019, the day before the auction, a Department employee mistakenly notified the Department personnel charged with preparing for the next day's auction that the taxes on Parcel 114 had been paid and that Parcel 114 should be removed from the list of properties for sale. As previously mentioned, the Code requires removal of the property from the sale if the property owner pays the delinquent taxes and costs or enters into an installment agreement

6

for payment by 5:00 p.m. the day before the sale. *See* § 7-38-66(F), (G). The final list of properties to be auctioned cannot be compiled until that deadline has passed.

{11}     Shortly before the start of the auction the next morning, the Department announced to the assembled potential bidders that Parcel 114 had been removed from the sale. The Department also placed Parcel 114 on its removed properties list. Department personnel assisting with the auction were approached by a registered bidder, Melissa Segura, who had come to the auction specifically to bid on Parcel 114. After confirming with the Department representative at the auction site, and with a telephone call to off-site Department staff, that Parcel 114 would not be sold at the auction that day, Ms. Segura left the auction. Department personnel reported that another person likely left as well. Parcel 114 remained on the list of properties removed from the auction for approximately thirty-five minutes before the county treasurer's office informed the Department that payment had not been made. At that point, the Department put Parcel 114 back on the list of properties to be auctioned that day. Returning a parcel to the auction list and auctioning it that day, after an announcement that the property had been removed from the auction, is contrary to Department policy. Department policy requires that the sale be rescheduled and notice again be given, in conformance with Code provisions. *See* § 7-38-67(G).

{12}     Parcel 114 was sold at auction that day to Purchaser, the sole bidder, for the minimum price of $17,100, the amount of taxes, penalty, interest and costs owed to

the state. Purchaser made payment prior to the close of the sale, as required by Section 7-38-67(F).

{13}    Two days after the tax sale, a deputy division director at the Department learned from Ms. Segura that she had left the auction in reliance on the Department's announcement and subsequent assurances that Parcel 114 would not be sold that day. Concluding that the auction did not substantially comply with the requirement of the Code for a public auction, following due notice, the Department invalidated the sale and returned Purchaser's payment.

{14}    Purchaser filed a petition for writ of mandamus in district court, asking the court to order the Department to issue a tax deed for Parcel 114 to him. Purchaser contended that the Department had a mandatory duty to issue and deliver a deed conveying Parcel 114 to him based upon the plain language of Section 7-38-70(A) of the Code. That section states that "[u]pon receiving payment for real property sold for delinquent taxes, the [Department] shall execute and deliver a deed to the purchaser."

{15}    The parties filed two sets of motions and cross-motions for summary judgment in the district court. Following hearing on the second set of motions and cross-motions, the district court granted summary judgment to Purchaser, agreeing with Purchaser that (1) the Department failed to establish any prejudice to any interest protected by the Code; (2) without proof of prejudice, the flaw in the public

8

auction was not "substantial or egregious" and the sale was, therefore, substantially in accordance with the Code's public auction requirement; and, in the alternative, (3) assuming the sale was not conducted substantially in accordance with the Code, the Department still had a mandatory duty under the plain language of Section 7-38-70(A) to issue and deliver a tax deed to Purchaser "upon receiving payment for real property sold for delinquent taxes." The district court entered a preemptory writ of mandamus ordering the Department to issue a tax deed for Parcel 114 to Purchaser.

{16}    The Department appealed.

**DISCUSSION**

{17}    This case raises two issues of first impression. Both are questions of statutory interpretation. We are first asked to determine whether the tax sale of Parcel 114 was conducted substantially in accordance with the Code. The facts relevant to this issue are not in dispute. The parties agree that the Department mistakenly announced to the assembled bidders just prior to the start of the auction that Parcel 114 had been removed from the list of properties to be auctioned that day. Then, after a period of time during which at least one person and possibly others who had come specifically to bid on Parcel 114 left the auction in reliance on the Department's announcement, the Department returned Parcel 114 to the auction and sold it that day for the minimum price to Purchaser, who was the sole bidder on the property. Applying the terms of the Code requiring that a tax sale be conducted by a public auction, after

9

due notice to potential purchasers, to these undisputed facts, we conclude that Parcel 114 was not sold substantially in compliance with the public auction requirement of the Code.

{18}     We also address the district court's alternative basis for granting a writ of mandamus: that the Department is required to issue a tax deed to the high bidder at a public auction upon receipt of payment, even if the Department subsequently determines that the sale was "flawed" and not substantially in compliance with the Code. Concluding that the Department's authority to invalidate a tax sale for substantial noncompliance with the Code continues until the Department issues the tax deed, we reverse and vacate the peremptory writ of mandamus.

## I.     The Tax Sale at Issue Was Not Conducted Substantially in Accordance With the Property Tax Code

## A.     Standard of Review

{19}     The interpretation of a statute is an issue of law that is subject to de novo review by this Court. *Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 10, 135 N.M. 397, 89 P.3d 69. "We [also] review de novo the [district] court's application of the law to the facts in arriving at its legal conclusions." *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 7, 129 N.M. 698, 12 P.3d 960.

{20}     Well-established principles of statutory construction guide this Court in interpreting our tax law. *See Sacred Garden, Inc. v. N.M. Tax'n & Revenue Dep't*, 2021-NMCA-038, ¶ 5, 495 P.3d 576. Although this Court begins with the plain

10

language of the provisions at issue, we are mindful that our goal is to determine the intent of the Legislature and to construe the statutory language consistent with the purposes the Legislature sought to achieve. *See Jordan v. Allstate Ins. Co.*, 2010-NMSC-051, ¶ 15, 149 N.M. 162, 245 P.3d 1214 (stating that our "primary goal when interpreting statutes is to further legislative intent").

{21}     In addition to these generally accepted principles of statutory construction, the Legislature has specifically directed that the provisions of the Code governing tax sales be read to require only that property be sold "substantially in accordance with the . . . Code." *See* § 7-38-70(B) ("If the real property was sold substantially in accordance with the . . . Code, the deed conveys all of the former property owner's interest in the real property."). This Court has held that the substantial compliance language of Section 7-38-70(B), "must overlay all the other statutes that comprise the . . . Code." *Cochrell*, 2003-NMCA-094, ¶ 17. Our review of statutorily-required tax sale procedures, therefore, is "not for the purpose of requiring letter-perfect compliance with each requirement of the statutes," but instead, to see "whether the general purposes of the statutes were served" by the sales procedure. *Id.*

**B.     The Interests the Legislature Intended to Serve by the Code Provisions Governing the Sale of Real Property for Delinquent Taxes**

{22}     The district court predicated its conclusion that the tax sale here was conducted substantially in accordance with the Code on what the court described as the absence of a showing that any interest protected by the Code was prejudiced by

11

allowing the sale to proceed after sending potential bidders away. The district court concluded "there is no genuine issue of material fact respecting: (1) prejudice to the title owner of the property or any interested or affected party, including the Department and the public-at-large, and that there was no such prejudice shown." The Department challenges this conclusion, contending that the Legislature's purpose in requiring that the sale of real property for delinquent taxes by public auction is to obtain the best return on the property for the benefit of the property owner. According to the Department, because potential bidders were turned away, the sale did not serve the intended purpose of the Legislature in requiring a public auction so as to obtain the best return for the property owner. It, therefore, was not in substantial compliance with the Code's public auction requirement.

{23}    Purchaser responds that the property owner has no right recognized by the Code to any compensation for the value of their property apart from payment of their debt to the state. Purchaser relies on this Court's decision in *Valenzuela v. Snyder*, in which this Court held that a property owner cannot set aside a properly conducted tax sale on the basis of an inadequate price in relation to the property's market value: "We conclude that inadequacy of the purchase price or gross disproportionality between the purchase price and the property's value are not grounds for setting aside a tax sale." 2014-NMCA-061, ¶ 12, 326 P.3d 1120. According to Purchaser, so long

12

as the amount bid is sufficient to fully compensate the state, the Legislature's purpose in requiring a sale by public auction has been satisfied.

{24} We are not persuaded. We agree with the Department that the Legislature intended, by requiring a public auction, to protect the interest of the property owner by requiring a procedure for sale that gives the property owner a reasonable opportunity to recover some of the excess value of their property. We explain.

{25} We begin our analysis with the plain language, considering the Code as a whole. *See id.* ¶ 16 ("[W]e should read the entire statute as a whole so that each provision may be considered in relation to every other part." (internal quotation marks and citation omitted)). We note the Legislature's enactment of Section 7-38-71(A), which requires, by its plain language, the distribution to the property owner of any amount paid at a tax sale in excess of the amount required to compensate the state for delinquent taxes, penalty, interest and costs. Section 7-38-71(A) provides for the distribution of the purchase price at auction as follows: first, the costs shall be retained by the Department; second, the penalties and interest due shall be retained by the Department; third, the delinquent taxes due shall be remitted to the state, and fourth, "the balance shall be paid to the former owner of the property sold." Although this section neither requires that the price paid at auction approximate the fair market value of the property, nor guarantees that the price paid will include any amount in excess of the property owner's debt to the state, it nonetheless recognizes

a property owner's interest in and right to receive any amount generated at public auction in excess of their debt to the state.

{26} After the briefs were filed in this appeal, the United States Supreme Court confirmed that a property owner whose property is sold by the state for delinquent taxes is entitled under the Takings Clause of the Fifth Amendment to the United States Constitution to any amount received in excess of the property owner's debt to the state. *See Tyler v. Hennepin Cnty., Minn.*, 598 U.S. 631 (2023) (concluding that a delinquent taxpayer has a property interest for purposes of the Takings Clause in any surplus exceeding the taxpayer's debt to the state, and holding unconstitutional a Minnesota statute allocating the surplus to the state). Although the constitutional underpinning of Section 7-38-71 is not at issue in this case, the United States Supreme Court's opinion in *Tyler* identifies the constitutional dimension of the property owner's interest recognized and protected by the Legislature in Section 7-38-71.

**C.     The Legislative Purpose in Requiring Sale of Real Property by Public Auction**

{27} The Department next argues that the district court erred concluding that the flaw in the Department's conduct of the public auction was not "substantial or egregious," and that the sale of Parcel 114, therefore, was conducted in substantial compliance with legislative intent. The Department contends that the essential component of a "public auction" is competitive bidding. The Legislature, according

14

to the Department, chose a public auction as the exclusive method for the sale of real property based on the reported success of public auctions in encouraging purchasers to pay a higher price than the price paid when property is sold by the government to a single purchaser.

{28}   We again look first to the words the Legislature chose and consider the plain meaning of those words. "Under the plain meaning rule, statutes are to be given effect as written without room for construction unless the language is doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction, in which case the statute is to be construed according to its obvious spirit or reason." *State v. Maestas*, 2007-NMSC-001, ¶ 9, 140 N.M. 836, 149 P.3d 936 (alteration, internal quotation marks, and citation omitted).

{29}   The term "public auction" is not defined by the Code. As the starting point for interpreting undefined terms contained in a statute, "our courts often use dictionary definitions to ascertain the ordinary meaning of words that form the basis of statutory construction inquiries." *State v. Lindsey*, 2017-NMCA-048, ¶ 14, 396 P.3d 199 (alteration, internal quotation marks, and citation omitted). *Black's Law Dictionary* 149 (11th ed. 2019), defines a "public auction" as the "public sale of property to the highest bidder." Our Supreme Court in *State ex rel. King v. Lyons*, relied on this dictionary definition of "public auction" in construing the term in the context of a statute requiring that the sale of public trust land be by public auction. 2011-NMSC-

15

004, ¶ 61, 149 N.M. 330, 248 P.3d 878. The Court in *King* also reviewed the origin and purpose of the state's use of public auctions to sell property, *id.* ¶¶ 61-65, concluding that public auctions are used "to obtain the best financial returns for the owners of the property sold." *Id.* ¶ 64 (internal quotation marks and citation omitted).

{30}     Given our previous discussion about the Legislature's recognition of the right of the property owner to any excess amount received at a tax sale, we are not persuaded by Purchaser's argument that the Legislature's purpose in mandating a sale by public auction is solely to facilitate the collection of the amount in delinquent taxes, penalty, interest and costs owed to the state. A public auction would not be required to achieve this purpose: simply prohibiting the Department from selling the property for less than the total owed to the state would suffice. It does not make sense for the Legislature to impose such extensive and potentially costly requirements for published notice to potential purchasers and for sale by public auction if the Legislature's sole objective was to obtain the minimum price that will pay the taxpayer's debt to the state. *See Provisional Gov't of Santa Teresa v. Doña Ana Cnty. Bd. of Cnty. Comm'rs*, 2018-NMCA-070, ¶ 27, 429 P.3d 981 (stating that the "[c]ourts will not construe a statute in a manner that leads to an absurd result[,]" especially where the plain language leads to a reasonable result). As explained previously, the recognized purpose of a public auction is to obtain the highest price possible by inviting competition for the property being sold. Reading the Code

provisions for sale by public auction and for notice to potential purchasers together with Section 7-38-71(A)(4)'s requirement that any balance of a sale, after payment to the state, "shall be paid to the former owner of the property sold," leads to the reasonable conclusion that our Legislature required a sale by public auction to obtain the highest price possible for the benefit of the property owner.

**D.     The Tax Sale of Parcel 114 Was Not Conducted Substantially in Accordance With the Public Auction Requirement of the Code**

{31}     We agree with the Department that the procedure employed by the Department for the sale of Parcel 114 failed to provide the essential elements of a properly conducted public auction, and that this prejudiced the interest of the property owner in recovering some amount for the excess value of their property. The tax sale, therefore, was not substantially in compliance with the Code.

{32}     As we noted previously, sale by public auction relies on published notice to attract potential purchasers to the auction, and then relies on competition among those bidders to achieve a higher price than could be obtained in a sale to a single purchaser. By announcing to the assembled bidders at the outset of the auction that Parcel 114 would not be sold that day, the Department essentially negated the prior notice to potential purchasers required by Section 7-38-67(B). The removal of the property from the list for auction and the Department's conduct in actively sending away those bidders who had been attracted to the auction to bid on Parcel 114 undermined the Legislature's purpose in requiring a public auction: attracting

17

bidders and relying on competition among them to increase the sale price. The sale, therefore, did not substantially comply with the Code's provisions for notice and public auction.

**II.     The Department Is Not Required to Execute and Deliver a Deed if the Property Was Not Sold in Substantial Accordance With the Code**

{33}     We next address the district court's alternative basis for issuing its writ of mandamus. The district court concluded, that even assuming the tax sale was not in substantial compliance with the Code, the Department nonetheless was "without discretion to withhold delivery of the deed to [Purchaser]" once the Department accepted payment at the conclusion of the auction.

{34}     The district court relied exclusively on the plain language of Sections 7-38-70(A) and -67(F) in arriving at its conclusion that issuance of a tax deed was mandatory "[u]pon receiving payment," and that the Department lacked authority to invalidate the sale once payment was received. Section 7-38-70(A) provides:

> Upon receiving payment for real property sold for delinquent taxes, the [Department] shall execute and deliver a deed to the purchaser.

Section 7-38-67(F) provides:

> Payment shall be made in full by the close of the public auction before an offer may be deemed accepted by the [D]epartment.

{35}     The sole dispute on appeal is whether the Legislature intended to end the Department's authority to invalidate a tax sale and begin the sale process anew when

18

payment is made, or instead to extend that authority until the Department verifies that the sale was conducted substantially in accordance with the Code and issues a tax deed to the purchaser.[3]

{36} Section 7-38-70(A), the sole provision relied on by the district court and by Purchaser to support the conclusion that the issuance of the deed is mandatory upon receipt of payment, is part of a statutory section that addresses the title conveyed by a tax deed. In Section 7-38-70, the Legislature adopts a strictly limited list of violations of the Code during a tax sale that the Legislature deems sufficient to defeat the title conveyed by the deed.

{37} Although acknowledging that a sale that is not in substantial compliance with the Code will defeat tax title, Purchaser contends that the Legislature intended to require the Department to issue the tax deed "upon payment," even if the Department later determined that the tax sale did not comply with the Code and that any deed issued would be invalid. According to Purchaser, the Legislature intended to require the Department to issue the invalid deed and to leave it to the property owner or other interested party to challenge the deed in court.

---

[3]It is settled law that the Department need not issue the deed immediately upon receiving payment at the close of the auction. In *Cano v. Lovato*, this Court held that a thirty-day delay in issuing the tax deed was in substantial compliance with the Code's requirement that the deed be executed and delivered "[u]pon receiving payment." 1986-NMCA-043, ¶ 23, 105 N.M. 522, 734 P.2d 762.

19

{38} Although Purchaser's "plain language" reading of Section 7-38-70(A) in isolation is arguably correct, it conflicts with the intent expressed by the Legislature in the remainder of Section 7-38-70, and in other provisions of the Code. We are reminded that our approach to statutory construction requires us to exercise caution in applying the plain meaning rule. *See State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352. As our Supreme Court held, even language seemingly clear on its face may mask reasons found in other provisions of the statute, in the rule's history or background, or found in a conflict between statutory wording and overall intent, that give rise to "genuine uncertainty as to what the [L]egislature was trying to accomplish." *Id.* This is an example.

{39} We note first that Section 7-38-70(D), in listing the grounds for invalidation of a tax deed in court, incorporates into the short list of grounds to defeat tax title references to Section 7-38-66, the provision defining the grounds on which a tax sale may be either prevented by the Department or, if already completed, invalidated by the Department. The Legislature's directive to the Department, in Section 7-38-66(D), (F), (G), and (H), to invalidate even a completed sale if the Department discovers violations in the sale, which would defeat tax title directly conflicts with the district court's and Purchaser's reading of Section 7-38-70(A) to prohibit the Department from invalidating a tax sale after payment is made at the conclusion of the auction. These provisions plainly state the Legislature's intent to *require* the

20

Department to invalidate a tax sale, even after payment has been made, if the Department discovers that the tax title would be invalid under Section 7-38-70(B)-(D), if the deed issues.

{40}    Because there is plainly a conflict on the face of the statute, we turn to the history and purpose of Section 7-38-70 to help us determine whether the Legislature actually intended to require the Department to issue a tax deed upon payment by the purchaser, even if the Department discovers the sale was not in compliance with the Code. In *Wine v. Neal*, our Supreme Court reviewed the history and purpose of Section 7-38-70 and concluded that the Legislature intended to strictly limit the grounds for defeating a tax title in order to "'clothe tax titles with a measure of certainty and security.'" 1983-NMSC-087, ¶¶ 17-18, 100 N.M. 431, 671 P.2d 1142 (quoting *Bailey v. Barranca*, 1971-NMSC-074, ¶ 16, 83 N.M. 90, 488 P.2d 725). The Legislature determined that it was important that a deed from the state convey something more than a risky title, subject to years of litigation. *Wine* and *Bailey* agree that the Legislature was attempting to avoid the issuance of tax deeds that would be subject to a court challenge. *Id.*

{41}    Looking then to Section 7-38-70 as a whole, with the Legislature's purpose of ensuring that a tax deed provides title that is as secure as possible in mind, and also noting the references in Section 7-38-70(D) to the Code provisions expressly allowing the Department to invalidate a completed sale, even after receipt of

21

payment, we are not convinced that the Legislature intended to require the Department to issue a tax deed it knows to be invalid. "We will not rest our conclusions upon the plain meaning of the language if the intention of the Legislature suggests a meaning different from that suggested by the literal language of the law." *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 30, 309 P.3d 1047 (alteration, internal quotation marks, and citation omitted). Because a plain meaning construction of Section 7-38-70(A) in isolation undermines the intent of the Legislature to ensure that tax deeds convey secure title, we conclude that the Legislature intended that the Department's authority to invalidate a substantially flawed tax sale to continue until the Department has reviewed the conduct of the sale and determined that a valid tax deed, conveying as certain and secure an interest in the property as possible, can be issued.

**CONCLUSION**

{42}    For the reasons stated, we reverse the district court's grant of a peremptory writ of mandamus.

{43}    **IT IS SO ORDERED.**

_____
**JANE B. YOHALEM, Judge**

22

**WE CONCUR:**

_____
**KRISTINA BOGARDUS, Judge**


_____
**JACQUELINE R. MEDINA, Judge**